USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __MAR 3 1 2017__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Miriam Alejandro,

                    Plaintiff,

          —v—

New York City Department of Education and
Emmanuel Polanco, Individually,

                    Defendants.

---

15-CV-3346 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Miriam Alejandro brings this action against her former employer the New York City Department of Education (the "DOE") and Principal Emmanuel Polanco in his individual capacity (together with the DOE, "Defendants"). Alejandro alleges that Defendants (i) discriminated against her on the basis of sex, age, and disabilities associated with dyslexia and human immunodeficiency virus ("HIV"), (ii) impermissibly refused to grant her requested medical leave, and (iii) retaliated against her for complaining of the alleged discrimination and for submitting leave requests, including by suspending her without pay on several occasions and ultimately terminating her employment. Alejandro asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, as amended in 2008; the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, *et seq.* Before the Court is Defendants' motion for summary judgment on all claims. For the reasons set forth below, Defendants'

1

motion is GRANTED with respect to the federal claims, and the Court declines to exercise supplemental jurisdiction over the NYCHRL claims.

## I.     Background

The following is drawn from the parties' Local Rule 56.1 statements and evidentiary exhibits cited therein.  As it must at the summary judgment stage, the Court construes the evidence in the light most favorable to Alejandro and draws all reasonable inferences in her favor.

Alejandro is an approximately 60-year-old woman who suffers from dyslexia and has been HIV-positive since the late 1980s.  *See* Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and Counterstatement of Facts, Dkt. No. 70 ("Pl. Resp."), ¶¶ 50, 64-65, 121.  Starting in September 2007, Alejandro was employed by the DOE as a "parent coordinator" assigned to Isobel Rooney Middle School 80/J.H.S. 080 The Mosholu Parkway ("M.S. 80").  *Id.* ¶¶ 1, 9.  For the first several years of her tenure as a parent coordinator, Alejandro served under Principal Lovey Mazique-Rivera.  *Id.* ¶¶ 76-84.  During that time, Alejandro's responsibilities included outreach to parents in the community as part of an effort to ameliorate negative public perceptions of M.S. 80 and facilitate enhanced parental involvement, and she maintained a small office within the school where she met with parents to address concerns and answer questions.  *Id.*  ¶¶ 77-79; Plaintiff's Ex. 1 (Miriam Alejandro Deposition Transcript), Dkt. No. 71-1 ("Alejandro Dep."), at 27-31; Plaintiff's Ex. 5 (Affidavit of Miriam Alejandro, dated April 8, 2013), Dkt. No. 71-5 ("April 2013 Alejandro Aff.") ¶ 5.

Alejandro disclosed to Principal Mazique-Rivera during her initial job interview that she was dyslexic, and advised that the condition could cause "little problem[s]" with her written work.  Pl. Resp. ¶¶ 80-81; Alejandro Dep. at 40-41.  In response, Rivera advised Alejandro that

she would make a notation in Alejandro's personnel file and speak with the DOE to determine

how to accommodate her condition.  Pl. Resp. ¶ 81; Alejandro Dep. at 40-41.  Alejandro did not

disclose her HIV condition to Mazique-Rivera at any time.  Alejandro Dep. at 103.  To

accommodate her dyslexia, Alejandro was ultimately permitted to use a device called a "phone

master" which, among other things, played back an audio version of Alejandro's word-processed

work and allowed her to more effectively screen for typos and other errors.  Declaration of

Miriam Alejandro, dated October 6, 2016, Dkt. No. 72 ("Alejandro Dec.") ¶ 2.

Alejandro worked for Mazique-Rivera substantially without incident through early 2012,

and a March 2012 performance evaluation for the 2011-12 school year described Alejandro as an

"excellent employee" who had "exceeded all of [Mazique-Rivera's] expectations," always

"me[t] the needs of our parents and students," and generally gone "over and above her job

description to ensure that M.S. 80 ha[d] an environment conducive for learning, student

achievement, and parent participation."  Pl. Resp. ¶ 84; Plaintiffs' Ex. 4 (2011-12 Performance

Evaluation), Dkt. No. 71-4.  Officially, the evaluation rated Alejandro's performance as

"Satisfactory."  *Id.*

### A.    Alejandro's Revised Job Responsibilities For the 2012-13 School Year

In April 2012, Defendant Polanco took over as the new principal of M.S. 80.  Pl. Resp.

¶ 12.  At the outset of the following school year, on approximately August 29, 2012, Polanco

orally advised Alejandro that she would no longer be responsible for community outreach or for

conducting meetings with parents, as those tasks had been reassigned to two or three newly hired

"community coordinators" and/or "community associates."  Pl. Resp. ¶¶ 66-67, 89; April 2013

Alejandro Aff. ¶¶ 22-24; Plaintiff's Ex. 6 (February 10, 2013 Letter from Alejandro to Polanco),

Dkt. No. 71-8, at 3.  These new employees included, at least initially, one to two females and one

to two males, all apparently in their 20s or 30s.  Pl. Resp. ¶¶ 65-67; April 2013 Alejandro Aff. ¶¶ 22-24; Alejandro Dep. at 64; Plaintiff's Ex. 6 at 3.  Polanco further informed Alejandro that her desk had been relocated from her small private office to M.S. 80's main office, and that her tasks would now include, among other things, greeting and directing parent visitors and maintaining a log of their visits, answering phones, and assisting in the translation of documents and parent-staff conversations.   Pl. Resp. ¶ 89; Plaintiff's Ex. 6 at 3; Plaintiff's Ex. 7 (August 31, 2013 E-mail from Alejandro to Polanco), Dkt. No. 71-9; Plaintiff's Ex. 23 (Affidavit of Miriam Alejandro, dated August 23, 2013), Dkt. No. 71-25 ("August 2013 Alejandro Aff.") ¶ 4.  Two days later, Alejandro sent Polanco an e-mail confirming her understanding of these new responsibilities.  Plaintiff's Ex. 7.

Several weeks later, on approximately September 19, 2012, Polanco held a meeting with Alejandro and provided her with a formal written description of her role as parent coordinator for the 2012-13 school year, which Alejandro acknowledged in writing.  Pl. Resp. ¶¶ 16-17, 91; Defendants' Ex. G (Parent Coordinator Job Description), Dkt. No. 58-7; Alejandro Dep. at 78-80.  That document set forth a list of tasks for Alejandro to carry out during the school year, including: developing and submitting a plan to increase parental engagement, preparing a monthly newsletter for distribution to parents, scheduling and organizing certain computer-based platform training for parents, maintaining parental sign-in sheets and a log of parental contacts, organizing parent-student trips, responding to parents' inquiries, visiting parents new to the community, conducting a monthly meeting for all parents, and recruiting parent volunteers to participate in school activities.  Defendants' Ex. G.  During the course of that meeting, Alejandro advised Polanco of her dyslexia and suggested that it would be difficult for her to prepare regular

4

newsletters. Alejandro Dep. at 149. Nothing in the record suggests that Alejandro disclosed her HIV status to Polanco at that time.

Following the meeting, Alejandro's understanding was that, moving forward, she would perform the tasks identified in the written job description while continuing to maintain responsibility for answering phones and performing the other clerical tasks that Polanco had orally assigned in late August. Pl. Resp.  ¶¶ 16-18, 90-91, 95; Alejandro Dep. at 79-81. Alejandro encountered difficulty performing all of these assignments in a timely manner and, on at least one occasion, e-mailed Polanco to request one hour of compensatory time per day to aid her in keeping parent visitor logs up to date while still executing her office management responsibilities. Polanco denied that request. Pl. Resp. ¶¶ 90, 95-96; Alejandro Dep. 79-81; Plaintiff's Ex. 8 (October 24, 2012 E-mail from Alejandro to Polanco), Dkt. No. 71-10; Plaintiff's Ex. 9 (October 24, 2012 E-mail from Polanco to Alejandro), Dkt. No. 71-11.

### B.   Alejandro's Attendance Record, First Suspension, and OEO Complaint

The M.S. 80 School Staff Handbook, a copy of which Alejandro received in September 2012, stated that it would be "considered excessive" for any employee to be absent for six or more days prior to January 31 and that such conduct could "result in a warning letter." Defendants' Ex. H (M.S. Staff Handbook), Dkt. Nos. 58-8-58-10; Pl. Resp. ¶ 19; Alejandro Dep. at 121. By the end of December 2012, Alejandro had already been absent on seven occasions, and, on January 4, 2013, Polanco notified Alejandro in writing that he had scheduled a disciplinary conference on January 9, 2013 to discuss her "attendance and performance." Defendants' Ex. I (January 4, 2013 Letter from Polanco to Alejandro), Dkt. No. 58-11; Defendants' Ex. J (January 4, 2013 Letter from Polanco to Alejandro), Dkt. No. 58-12; Pl. Resp. ¶¶ 21-22. Alejandro failed to attend the January 9 conference and two additional conferences

rescheduled by Polanco for January 11 and January 16, 2013, respectively.  Pl. Resp. ¶¶ 21-25;

Defendants' Ex. L (January 2013 Suspension Letter from Polanco to Alejandro).  Alejandro

attributes her failure to attend these conferences to her union representative's inability to

participate on two of the dates and to her own need to visit a terminally ill nephew in North

Carolina – and thus miss work – for a period of time encompassing the third date.  The record

reflects that each of these issues was contemporaneously documented in correspondence from

Alejandro and/or her union representative to Polanco.  There is no evidence that Polanco

responded in writing to these messages, although he did deny Alejandro's short-notice request

for personal days to visit her nephew.[1]

    After the third scheduled conference failed to go forward on January 16, 2013 Polanco e-

mailed Alejandro to advise her that he would be "forced to make a determination without [her]

input."  Plaintiff's Ex. 18 (January 16, 2013 E-mail from Polanco to Alejandro), Dkt. No. 71-20.

Subsequently, Polanco issued Alejandro a formal letter suspending her for one week without pay

starting on January 22, 2013.  Defendant's Ex. L (January 2013 Letter from Polanco to

Alejandro), Dkt. No. 58-14.  As the basis for the suspension, Polanco cited: (i) Alejandro's nine

absences to date (including two days taken without permission in mid-January to visit her ill

nephew); (ii) Alejandro's purported "pattern" of extending weekends and otherwise taking

consecutive days off; (iii) her failure on certain occasions to comply with the M.S. 80's policy

requiring requests for personal days at least one week in advance; (iv) her absence on a day for

which she had been *denied* a floating holiday; and (v) her failure to attend the three scheduled

---

[1] *See* Pl. Resp. ¶¶ 21-25; Plaintiff's Ex. 12 (January 7, 2013 E-mail from Alejandro to Polanco), Dkt. No.
71-14; Plaintiff's Ex. 13 (January 8, 2013 E-mail from Alejandro to Polanco), Dkt. No. 71-15; Plaintiff's Ex. 14
(Alejandro's January 2013 Personal Day Request Form), Dkt. No. 71-16; Plaintiff's Ex. 15 (January 9, 2013 E-mail
from Alejandro to Polanco), Dkt. No. 71-17; Plaintiff's Ex. 16 (January 15, 2013 E-mail from Alejandro to
Polanco), Dkt. No. 71-18; Plaintiff's Ex. 17 (January 16, 2013 E-mail from Union Representative to Polanco), Dkt.
No. 71-19.

disciplinary conferences in January. *Id.* Polanco subsequently confirmed during deposition that

it was a "combination" of attendance-related issues that precipitated Alejandro's suspension,

including not only the absolute number of absences but also her failure to follow policy with

respect to requesting personal days and her perceived "resistance" to attending the scheduled

disciplinary conference. Plaintiff's Ex. 2 (Emmanuel Polanco Deposition Transcript), Dkt. No.

71-2 ("Polanco Dep."), at 265-67. Polanco also testified that while no employees other than

Alejandro were suspended based on their attendance record during the first half of the 2012-13

school year, approximately five others were "disciplined" in some way. *Id.* at 178.

Following her suspension, in late January or early February 2013, Alejandro filed an

online complaint against Polanco with DOE's Office of Equal Opportunity & Diversity

Management ("OEO"), alleging age discrimination, sex discrimination, and retaliation.

Plaintiff's Ex. 25 (Correspondence between Alejandro and OEO), Dkt. No. 71-29. In a letter in

support of her complaint dated January 22, 2013, Alejandro, among other things, recounted

many of the events set forth above and asserted that Polanco had effectively "replaced" many of

Alejandro's responsibilities as parent coordinator "with more school secretary's responsibilities"

and had denied a request for compensatory time to complete her newly assigned tasks. *Id.* She

also noted that Polanco "constantly accuse[d] [her] of going against his directives or interests,"

and described several incidents in which Polanco had allegedly expressed the view that

Alejandro had not timely completed certain assignments, had submitted work reflecting

grammatical errors, or had handled an interaction with a parent in some unfavorable way. *Id.*

On February 7, 2013, OEO responded to Alejandro, stating that it would not investigate

the retaliation complaint, which it viewed as premature, but inviting Alejandro to contact the

assigned OEO officer to schedule an interview to discuss her discrimination complaints. *Id.* On

7

February 12, 2013, OEO interviewed Alejandro.  Defendants' Ex. EE (February 26, 2013 Letter

From OEO to Alejandro), Dkt. No. 58-33.  In a letter dated February 26, 2013, OEO notified

Alejandro that it was administratively closing her case and taking no further action based on her

failure to identify any comments by Polanco as to Alejandro's age or sex, any express indication

that Polanco had hired certain people to assume responsibilities previously assigned to Alejandro

because they were younger than she was, or any specific examples of Polanco treating females

differently than he treated males.  *Id.*

      **C.**     **Alejandro's Performance Record and Second Suspension**

      On January 16, 2013, the same day on which Polanco e-mailed Alejandro to note that he

would have to make a disciplinary determination regarding her attendance issues without her

input, he also sent her a separate letter advising that he had scheduled another disciplinary

conference to discuss her "performance" on January 22, 2013 – the date that would ultimately

constitute the first day of her initial unpaid suspension.  Pl. Resp. ¶¶ 27, 112; Plaintiff's Ex. 19

(January 16, 2013 Letter from Polanco to Alejandro), Dkt. No. 71-21.  On January 23, 2013, the

second day of Alejandro's suspension, Polanco sent her another letter rescheduling the

disciplinary conference for January 30, 2013, the day after her return from suspension.  Pl. Resp.

¶¶ 27, 113; Plaintiff's Ex. 20 (January 23, 2013 Letter from Polanco to Alejandro), Dkt. No. 71-

22.  According to Alejandro, she and union representatives attempted to meet with Polanco on

February 1, 2013, but Polanco refused.  Pl. Resp. ¶ 114; Alejandro April 2013 Aff. ¶ 41.  In any

event, the conference was subsequently rescheduled yet again and ultimately went forward on

February 5, 2013.  Pl. Resp. ¶ 115; Defendants' Ex. N (February 2013 Suspension Letter from

Polanco to Alejandro), Dkt. No. 58-16.

Alejandro attended the February 5 conference with two union representatives, and Polanco attended with M.S. 80's Assistant Principal, Ricardo Irizarry, who served as note taker. Pl. Resp. ¶ 115; Defendants' Ex. N.  During the conference, the participants discussed Alejandro's performance of the tasks set forth on the job description document that Alejandro received from Polanco in late September 2013. Pl. Resp. ¶ 115; Defendants' Ex. N.  Polanco expressed the view that Alejandro's performance on several such tasks had been inadequate.  Pl. Resp. ¶ 115.  According to Alejandro, she advised Polanco again during the February 5 conference that her dyslexia made it difficult for her to accurately complete certain written assignments and requested that Polanco designate another staff member to assist in reviewing her work and fixing any errors.  Alejandro Dep. at 191-92.

Shortly after the February 5 conference, Polanco issued a letter to Alejandro based on the substance of their discussion.  In the letter, Polanco listed fourteen of the fifteen individual tasks appearing on Alejandro's September 2013 job description, set forth his determination as to whether and to what extent Alejandro had met expectations with respect to each task, and then described the rationale for the individual determinations, including by recounting Alejandro's responses during the conference to Polanco's questions on the relevant subject.  Defendants' Ex. N.  In total, Polanco determined, according to the letter, that Alejandro had either failed to complete, inadequately completed, or completed in a delinquent manner the following thirteen tasks:

- Maintain a satisfactory record of attendance and punctuality (**Inadequately Completed**);

- Submit a plan to increase parent engagement to the principal by September 24, 2012 (**Completed Late**)

- Prepare monthly parent newsletters to be sent home with students, mailed out, and emailed when possible.  First one should be sent out by September 21st.

The newsletters for the following months should be sent out by the end of the 1st Friday of every month (**Not Completed in Part and Otherwise Completed Late**);

- Schedule and organize ARIS Parent Link training for all parents by December 1st (**Inadequately Completed**);

- Keep a log with all parental contacts made.  It should be updated daily and be readily available anytime.  (**Inadequately Completed**);

- Schedule and Coordinate vote for PA President for Wednesday, September 26th (**Completed Late**);

- Collect accurate contact numbers for all parents and ensure that it is updated on ATS (**Inadequately Completed**);

- Ensure that translation is done for all parent communications sent (**Inadequately Completed**);

- Create Sign-in sheets for all parent activities (**Inadequately Completed**);

- Recruit parent volunteers for the purpose of assisting the school in its activities (**Inadequately Completed**);

- Conduct a monthly parent meeting for all parents (**Inadequately Completed**);

- Organize three parent-student trips for the academic year (**Not Completed**);

- Respond to inquiries (e.g., community programs, assistance, etc.) for the purpose of providing information and/or direction (**Inadequately Completed**).

Based on these purported shortcomings in her professional performance, Polanco's letter advised, Alejandro would be suspended without pay for an additional two weeks, starting on February 11, 2013.  *Id.*  Polanco also placed Alejandro on notice that if she continued to "neglect [her] duties and engage in a pattern of incompetent services," she would be suspended without pay for a longer period of time or terminated.  *Id.*

Alejandro received Polanco's letter on February 8, 2017.  Plaintiff's Ex. 6.  Two days later, she responded with a lengthy letter of her own, accusing Polanco of attempting to

"eliminate [her] employment at M.S. 80 . . . through intimidation, fabrication of allegations that are untrue and decepti[ve]," and "harassment." *Id.* In her letter, Alejandro purported to refute many of the charges that Polanco set forth in his letter, at times referring to attached documentary evidence in support of several of her positions. Among other things, Alejandro emphasized that, despite Polanco's suggestions that Alejandro alone was responsible for the multiple reschedulings of her disciplinary conferences in January 2013, much of the scheduling difficulty in was in fact attributable to Polanco's failure to communicate effectively with Alejandro's union representatives. *Id.* She also argued at length that her double slate of assignments (the office management work orally assigned in August 2013 and the more traditional parent coordinator tasks listed on the September 2013 job description) made it all but impossible for her to effectively discharge the parent coordinator responsibilities discussed in Polanco's letter. *Id.* Finally, Alejandro denied that many of the assignments referenced in Polanco's letter had been submitted late or otherwise completed inadequately. *Id.* She cited specific examples of project drafts (such as the parental engagement plan) that she had submitted in advance of Polanco's deadline but for which she had then received no feedback or acknowledgement until after the relevant deadline had passed. *Id.* She also explained that other projects (such as the monthly newsletter) were completed late largely because Polanco himself failed to timely provide the necessary approvals. *Id.* Alejandro further noted that other tasks (such as translation of staff-parent communications) could not be completed because Polanco had not approved the funding required by DOE translation personnel, despite indicating that he would do so. In addition, certain projects (such as conducting monthly parent meetings and recruiting parent volunteers to assist in school activities) were, according to Alejandro, impossible to accomplish because Polanco had declined to approve funding for certain training

11

that Alejandro believed was necessary or because Polanco had specifically instructed Alejandro never to leave the main office other than to take lunch or use the restroom. *Id.*

Whatever the reasons why, Alejandro confirmed at deposition that she did not perform at least some of the tasks appearing on the September 2013 job description during the 2012-13 school year. *See, e.g.,* Alejandro Dep. at 83-87, 237-244 (testifying that she did not, for example, hold monthly parent meetings, did not plan parent-student trips, did not consistently distribute monthly newsletters, did not log all telephone-based or in-person communications with parents, and failed to ensure translation of parent communications into languages other than English).

### D.    Third Suspension

According to Alejandro, following her return from the February 2013 suspension, a member of M.S. 80's secretarial staff with whom Alejandro shared an office (Ms. Hughes) started to review her written work, with Polanco's knowledge, permission, and encouragement. Alejandro Dep. at 112-113, 191-92.  The arrangement was consistent with an agreement that Alejandro and Polanco reached during the February 5 conference. *Id.* at 112-13.

On March 21, 2013, Polanco convened yet another disciplinary conference with Alejandro and her union representatives, the stated purpose of which was to "discuss a pattern of insubordination" by Alejandro.  Pl. Resp. ¶ 32-33; Defendants' Ex. O (April 14, 2013 Letter from Polanco to Alejandro), Dkt. No. 58-17.  Several weeks later, on April 14, 2013, Polanco issued a letter setting forth his decision to once again suspend Alejandro without pay for two weeks, starting on April 18, 2013.  *Id.*  As the basis for the suspension, Polanco identified an incident in mid-March 2013 in which Alejandro purportedly distributed flyers to students and parents which had not been approved by Polanco – a violation of school policy as reflected M.S.

80's Staff Handbook – and which reflected a "typo/misspelling that . . . reflect[ed] negatively on our professional community." Defendants' Ex. O. Polanco noted in the letter Alejandro had posted enlarged copies of the offending flyer "all over the school walls," and then failed to remove them despite Polanco's express instruction to do so. *Id.* Polanco further stated that he had previously warned Alejandro about disseminating unapproved documents to students and parents. *Id.*

Polanco also included in his letter copies of mid-March email correspondence between Alejandro and Polanco, in which Polanco cited concerns over typos and grammatical and spelling errors regularly reflected in Alejandro's written work more generally (including newsletters, calendars, and workshop flyers). *Id.* Polanco referenced the agreement the two had reached during the February 2013 disciplinary conference by which Alejandro would arrange for a colleague to proofread her written work prior to submission, urged her to adhere to that practice more consistently, and noted that while mistakes were understandable, she had failed to seek out the necessary support. *Id.* Polanco concluded his letter by expressly putting Alejandro on notice that if her purportedly "insubordinate and unprofessional conduct" were to continue, he would "have no choice but to terminate [her] employment." *Id.*

Alejandro testified at deposition that she distributed and posted the flyers in question because their content derived from a notice issued by the Chancellor of the DOE, she believed it was a parent coordinator's responsibility to distribute Chancellor notices in a timely manner, and she had been unable to reach Polanco to secure sign-off. Alejandro Dep. at 129, 150-51; Pl. Resp. ¶¶ 33-36.

Alejandro did not deny the recurrence of typographical and other errors appearing in her written work. She testified, in fact, that Polanco raised the issue with her on a few occasions and

in one meeting criticized Alejandro in insulting terms over one particular error, telling her that a "third grader" could do the relevant task properly and stating, "You can't read." *See, e.g.,* Alejandro Dep. at 148. According to Alejandro, she responded by reminding Polanco of her dyslexia and emphasizing that she tended to make more mistakes under stressful conditions. *Id.*

### E.   EEOC Discrimination Charge and Cease-and-Desist Letter

On April 10, 2013, Alejandro filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging age and sex discrimination and interference with Alejandro's rights under the FMLA, the ADEA, Title VII, the NYCHRL, and the New York State Human Rights Law. Pl. Resp. ¶ 5; Defendant's Ex. B (EEOC Discrimination Charge), Dkt. No. 58-2.

On April 11, 2013, an attorney representing Alejandro, Fausto E. Zapata, Jr., sent Polanco a cease-and-desist letter. The letter explicitly advised Polanco of Alejandro's dyslexia, noted that it was "considered a disability" under the ADA and the NYCHRL, and demanded that Polanco accommodate her "by assisting her editing assignments, i.e. the newsletter" and by "refraining from making disparaging remarks about [Alejandro's] intellect when discussing her writing assignments." Plaintiff's Ex. 26 (April 11, 2013 Letter from Zapata to Polanco). The letter also accused Polanco of "interfering" with Alejandro's exercise of her rights under the FMLA, including her submission of a formal leave request in February 2013 (*see infra* Section I.G.). *Id.*

Polanco forwarded Zapata's letter to a DOE staff attorney, who responded to Zapata by e-mail on April 18, 2013, explaining that in order for the DOE to process Alejandro's request for an accommodation, Alejandro would have to complete certain paperwork and submit it to DOE's Medical Administration. Pl. Resp. ¶ 53. Alejandro never submitted the referenced paperwork to

the DOE's medical administration, and, indeed, never submitted documents of any kind concerning her dyslexia to the DOE. *Id.* ¶¶ 53-54.

### F.    Termination

On June 25, 2013, Polanco conducted yet another disciplinary conference with Alejandro and a union representative.   At that meeting, which Alejandro surreptitiously recorded unbeknownst to the other participants, Polanco accused Alejandro of failing to adequately complete several assignments set forth on a modified task list that Polanco had developed for Alejandro several months earlier. Pl. Resp. 39; Defendant's Ex. Q (July 3, 2013 Letter from Polanco to Alejandro), Dkt. No. 58-19.  The parties' stipulated transcript of that conference reflects extensive – and often indecipherable – argument between the participants as to the reasons for Alejandro's purported delinquencies.  In particular, Alejandro repeatedly emphasized to Polanco that her office management tasks, especially her responsibilities for answering phones and greeting and logging parent visitors, made it difficult for her to attend to other work. Defendants' Ex. R (Stipulated Transcript of June 25, 2013 Conference), Dkt. No. 58-20, at 7-8, 12, 17-19.  Alejandro noted that she had apprised Polanco of the difficulty before and had requested additional time to complete her traditional parent coordinator assignments. *Id.* at 10, 12.  She also pointed out that her multiple suspensions had precluded her from completing certain assignments and that certain written materials had not been distributed to parents because M.S. 80 could not provide her with necessary postage. *See, e.g.*, *id.* at 4-5, 15, 37-39.

In a letter dated July 3, 2013, Polanco, purportedly, recounted the substance of the June 25 meeting and terminated Alejandro's employment. As in earlier letters, Polanco set forth the basis for his decision at some length, listing various specific tasks set forth in Alejandro's modified job description and noting Alejandro's alleged failure to address them as well as her

proffered justifications. Defendant's Ex. Q. The letter accused Alejandro of, for example, failing to conduct monthly parent meetings; to organize parent-student trips; to organize technology trainings for parents; to maintain complete and up-to-date logs of parental contacts; and to ensure translation of all parent communications. *Id.* Citing Alejandro's multiple previous disciplinary conferences and suspensions and her modified work plan, the letter asserted that Alejandro had been afforded "endless support and intervention to improve [her] performance" and "opportunity after opportunity to show [Polanco] that [she] care[d] about this job," but was evidently "either unwilling or unable to improve" her performance. *Id.*

Following Alejandro's termination, a female was hired to fill the parent coordinator position. Pl. Resp. ¶ 69.

### G.    Alejandro's FMLA Requests

As this course of events was unfolding, Alejandro submitted, on February 28, 2013, a DOE form request for leave under the FMLA to Polanco's secretary, Elizabeth Gonzalez. Pl. Resp. ¶ 56. Later that day, Gonzalez e-mailed Alejandro to advise her, correctly, that the form reflected an error because someone had already signed on the supervisor/principal's line where Polanco would have to sign. Gonzalez requested that Alejandro rectify the error and resubmit the request.  Pl. Resp. ¶ 58; Defendants' Ex. W (February 28, 2013 E-mail from Gonzalez to Alejandro), Dkt. No. 58-25; Defendants' Ex. V (February 2013 FMLA Request Form), Dkt. No. 58-24. Alejandro subsequently resubmitted a corrected FMLA request form, which Polanco executed. The application was then submitted to DOE's Medical, Leaves and Records Administration ("Leaves") for processing, consistent with DOE policy. Pl. Resp. ¶ 59; Defendants' Ex. X (March 2013 FMLA Request Form), Dkt No. 58-26; *see also* Defendant's Ex. Z (Clayton E. Newman Deposition Transcript), Dkt. No. 58-28 ("Newman Dep."), at 37

16

(explaining that Leaves reviews FMLA applications and determines if employees qualify for leave).

Like Alejandro's original application, the corrected form reflects a request for intermittent leave to address Alejandro's own health condition (rather than, for example, a family member's condition).  Defendants' Ex. X.  The portion of the form to specify a date of leave commencement and probable return date is blank.  *Id.*  The physician's section of the form, completed by hand, is difficult for the Court to decipher.  The diagnosis section contains one inscrutable word (which the parties do not purport to be able read) followed by what appears to be a three-digit numeric code.  *Id.*  The physician portion appears to note that the probable duration of Alejandro's condition as "indefinite" and to list unspecified "medication" as the only course-of-treatment information.  It also appears to indicate that Alejandro would not be able to perform work of any kind "during episodes."  *Id.*  On the line to estimate the period of time during which Alejandro would need care, the physician wrote, as best as the Court can decipher, "Will need to miss work during examinations."  *Id.*

By letter dated April 3, 2013, Leaves advised Alejandro that her application could not be processed because certain "required information" was "missing."  Defendants' Ex. Y (April 3, 2013 Letter from Leaves to Alejandro), Dkt. No. 58-27.  Specifically, the letter noted, Alejandro's application was "[m]issing detailed medical documentation" and "[m]issing start and end date[s]."  *Id.*  The letter concluded by requesting that Alejandro forward the requested documentation within twenty-one business days and inviting her to contact human relations with any questions.  *Id.*

Alejandro did not submit any additional information to Leaves.  Pl. Resp. ¶ 61.  By letter dated June 4, 2013, Leaves advised Alejandro that her request had been denied based on

insufficient documentation, her lack of response to Leaves' request for additional information, and the "incomplete" status of the application. Defendants' Ex. AA (June 4, 2013 Letter from Leaves to Alejandro), Dkt. No. 58-29. Polanco also orally advised Alejandro of this denial during the June 25, 2013 disciplinary conference. Defendants' Ex. R at 1.

In late June 2013, shortly before her termination, Alejandro again submitted a request for intermittent FMLA leave, this time based on a diagnosis of "Major Depressive Disorder – acute," seeking permission to leave work thirty minutes early to participate in therapy sessions. Pl. Resp. ¶ 126; Plaintiff's Ex. 22 (June 2013 FMLA Request Form), Dkt. No. 71-24.

### H.    Right-to-Sue Letter and Instant Case

On January 29, 2015, the EEOC issued Alejandro a right-to-sue letter, advising that it was unable to conclude that the information it had obtained established statutory violations. Pl. Resp. ¶ 7; Dkt. No. 1. Alejandro initiated this action on April 29, 2015.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden may be carried by a demonstration that the nonmoving party, "after adequate time for discovery," has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's

18

case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) ("A defendant is entitled to summary judgment where the plaintiffs have failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim on which the plaintiffs bear the burden of proof.") (alterations, citation, and internal quotation marks omitted). If the movant satisfies its burden, the non-moving party must then "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, it must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation omitted). The non-movant may rely neither on "mere allegations or denials of [its] pleadings," *id.* at 248, nor on "mere speculation or conjecture as to the true nature of the facts," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Indeed, "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *Ridinger v. Dow Jones & Co., Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted). Furthermore, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

At the summary judgment stage, "a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). In considering a summary judgment motion, a court is not to "weigh evidence or assess the credibility of witnesses." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v.*

*Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The pertinent question at this stage is only "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

The Court of Appeals has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). Indeed, "[b]ecause direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation and internal quotation marks omitted). At the same time, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), and the remedy clearly "remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact," *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

## III.    Discussion

### A.    Sex Discrimination Under Title VII Against the DOE

#### 1.    Legal Framework

Under Title VII, it is unlawful for an employer to intentionally discriminate against any individual on the basis of that individual's sex. 42 U.S.C. § 20000e-2(a)(1). Like many of the claims discussed below, claims of sex-based discrimination brought pursuant to Title VII are analyzed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walsh v. N.Y.C. Housing Auth.*, 828 F.3d 70,

20

74 (2d Cir. 2016). Under that framework, it is initially the plaintiff's burden to establish a *prima facie* case of sex discrimination. *Id.* To do so, the plaintiff must demonstrate that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal." *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) (citation omitted).

"Once a plaintiff has established a *prima facie* case, the burden of production shifts to the employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its action." *Bickerstaff*, 196 F.3d at 446. This burden "also is not a demanding one; she need only offer such an explanation for the employment decision." *Id.* Still, the employer's explanation must at least be "clear and specific." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (citations omitted).

If the employer articulates an explanation, the "presumption of discrimination is eliminated, and 'the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Sattar v. Johnson*, 129 F. Supp. 3d 123, 137 (S.D.N.Y. 2015) (ellipsis in original) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)). Specifically, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in

part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (internal

quotation marks omitted); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009)

(recognizing that Congress has explicitly authorized Title VII discrimination claims "in which an

improper consideration was 'a motivating factor' for an adverse employment decision") (citing

42 U.S.C. § 2000e-2(m)).  Such evidence may include, for example, a demonstration "that 'the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination.'" *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting

*Burdine*, 450 U.S. at 253).  Notably, the plaintiff, having established a *prima facie* case, is not

necessarily required to "introduce additional, independent evidence of discrimination" at this

final stage of the analysis, and, "[i]n appropriate circumstances," evidence that an employer's

proffered explanation is false may without more suffice to allow a reasonable trier of fact to

"infer . . . that the employer is dissembling to cover up a discriminatory purpose." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 149 (2000).  Nevertheless – and of some

importance here – notwithstanding the burden-shifting of the *McDonnell Douglas* framework,

the plaintiff retains at all times "'[t]he ultimate burden of persuading the trier of fact *that the*

*defendant intentionally discriminated against*" her.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 507 (1993) (emphasis added) (brackets in original) (quoting *Burdine*, 450 U.S. at 253)).  As

such, "it is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, 'the

fact-finder must believe the plaintiff's explanation of intentional discrimination.'" *Sattar*, 129 F.

Supp. 3d at 137-38 (additional internal quotations marks omitted) (quoting *Reeves*, 530 U.S. at

147); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ("plaintiff must

produce not simply some evidence, but sufficient evidence to support a rational finding that the

legitimate, non-discriminatory reasons proffered by the defendant were false, and that more

likely than not discrimination was the real reason for the employment action") (internal quotation marks and brackets omitted); *Bickerstaff*, 196 F.3d at 446-47 (plaintiff's opportunity to demonstrate that the employer's proffered reason was false . . . merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination," and a showing "that the proffered reason was false" constitutes "one means to support [the plaintiff's] ultimate burden of proving discrimination").

### 2.     Alejandro Fails to Establish a Prima Facie Case of Sex Discrimination

Defendants contend that Alejandro falls short of establishing a *prima facie* case of sex discrimination.  Even recognizing the minimal nature of a plaintiff's burden at that stage, the Court agrees.

Even assuming *arguendo*, that Alejandro was a member of a protected class (as she clearly was), that she was qualified for the parent coordinator position, and that she was subject to adverse employment actions (in the form of multiple unpaid suspensions and, ultimately, termination), the record is, quite simply, devoid of evidence from which a reasonable juror could infer that Defendants discriminated against Alejandro on the basis of her sex.  Alejandro undisputedly recalls no invidious comments of any kind or any gender-based critiques of her professional performance or conduct. Pl. Resp. ¶ 70; Alejandro Dep. at 60-61.  And Alejandro identifies not a single specific instance of an otherwise similarly situated male colleague enjoying any sort of preferential treatment relative to her.[2]  *See, e.g., Graham v. Long Island*

---

[2] Alejandro does emphasize in her opposition papers that she "was the only employee suspended for absences the entire school year," even though others were apparently absent for more than six days by the end of January 2013.  Plaintiff's Memorandum of Law in Opposition to Defendant' Motion for Summary Judgment, Dkt. No. 69 ("Opp."), at 20.  That may be.  But, as noted, Polanco offered unrebutted testimony that he suspended Alejandro that month based not solely on her absolute number of absences but rather on a "combination" of attendance-related factors, including Alejandro's failure to follow school policy when requesting personal days, her pattern of extending preexisting time off, and her perceived "resistance" to attending the scheduled disciplinary conferences.  Polanco Dep. at 265-67.  Alejandro does not even attempt to present evidence that any other

*R.R.*, 230 F.3d 34, 39-40 (2d. Cir. 2000)  ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.") (internal quotation marks omitted).

While Alejandro does maintain that Polanco "transferred a significant portion of her job duties to a . . . male employee," Opp. at 11, the unrebutted evidence before the Court, including Alejandro's own testimony, belies that particular characterization of the pertinent events. Indeed, the only reasonable conclusion to be reached from the record evidence is that certain of Alejandro's parent coordinator tasks were reassigned to *both* male *and* female colleagues. *See, e.g.*, Alejandro Dep. at 64 ("Q: On August 29, 2012, you are saying that Mr. Polanco said that you are never to speak to the parents against and you agreed? A: Correct. He had another *lady* that he had hired to do that. Q: Who was the person? A: Her name was, um Maura [phonetic spelling]. I got the name in my mind and I can't remember it. . . . It is a Spanish *lady*.") (emphasis added); April 2013 Alejandro Aff. ¶¶ 22-24 ("To elaborate further, since on or about August 31, 2012, Principal Polanco has assigned most of my duties to Mr. Veras and Ms. Mircelo, a young *woman*.") (emphasis added). Alejandro expressly concedes, moreover, that upon her termination, another female was hired to fill her position as parent coordinator. Pl. Resp. ¶ 69. Perhaps for these reasons, Alejandro repeatedly declined at deposition to even identify her sex as a suspected basis for the discrimination she alleges. *See, e.g.*, Alejandro Dep. at 58-61 ("Q: So besides the age, your emotional stress, dyslexia, any other reasons why you think that you were discriminated against? A: No.").

---

employee – male or not – was similarly situated to her on these fronts. And without any evidence, no reasonable juror could conclude that they were. *See, e.g.*, *Graham*, 230 F.3d at 42 (to be similarly situated for purposes of disciplinary action, employees "must have been subject to the same disciplinary standards *and have engaged in conduct of comparable seriousness*") (emphasis added).

24

The Court recognizes that Alejandro has proffered several complaints filed against Polanco and the DOE in New York State Supreme Court by other current or former M.S. 80 female staff members. Certain of these complaints allege sex discrimination among other things. *See* Plaintiff's Ex. 27 (Discrimination Complaints), Dkt. No. 71-31. But, while it may be true, as Plaintiff notes, that "[e]*vidence* of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment or to a disparate impact claim," Opp. at 13 (quoting *Chin v. Port Auth. of N.Y & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012)) (emphasis added), it is equally true that "the as-yet unverified charges of . . . other charging parties [] do not constitute admissible evidence establishing misconduct by the employer." *E.E.O.C. v. Morgan Stanley & Co., Inc.*, 132 F. Supp. 2d 146, 153 (S.D.N.Y. 2000); *see also Henderson v. City of N.Y.*, 818 F. Supp. 2d 573, 580 (E.D.N.Y. 2011) ("allegations unsupported by any evidence are insufficient to defeat summary judgment"). Even assuming, moreover, that these sorts of complaints could be admitted to support Alejandro's allegations, the Court is aware of no authority, and Alejandro identifies none, for concluding that a discrimination plaintiff has established a *prima facie* case based *entirely* – or even primarily – on *others'* unsupported allegations of harassment directed at *them*.[3]

For these reasons, the Court concludes that, on the undisputed record and drawing all reasonable inferences in Alejandro's favor, there is insufficient evidence to support even a minimal reasonable inference that Alejandro's sex was a motivating factor in Defendants' decisions to suspend and ultimately terminate her. Alejandro has therefore failed to establish a

---

[3] It bears noting specifically that *Chin*, the Court of Appeals decision relied upon by Alejandro, does not authorize reliance on unsubstantiated, individual colleague-level allegations to support an inference of discrimination against a plaintiff. The pertinent portion of *Chin* primarily concerns statistical evidence of employer-wide hiring and promotion practices proffered by experts and evidence of specific discriminatory employment policies and practices. *Chin*, 685 F.3d at 150-55.

*prima facie* case of sex discrimination.  *See, e.g., Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106-07 (2d Cir. 1989) (concluding that plaintiff failed to make out a *prima facie* sex discrimination case when she "present[ed] no evidence, statistical or circumstantial, to justify an inference that [defendant employer] made gender a factor in its termination decision").  Defendants' motion for summary judgment on this claim is GRANTED.

### B.    Age Discrimination Under the ADEA Against the DOE

#### 1.    Legal Framework

The ADEA "makes it unlawful for an employer to take adverse action against an employee 'because of such individual's age.'"  *Gross*, 557 U.S. at 169 (quoting 29 U.S.C. § 623(a)).  Similar to Title VII claims, discrimination claims under the ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework, with the notable distinction that the ADEA includes, as recognized by the Supreme Court, a relatively more stringent causation requirement.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).  Specifically, "'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor."  *Id.* (quoting *Gross*, 557 U.S. at 180).

"In order to establish a *prima facie* case of age discrimination, [a plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination."  *Gorzynski*, 596 F.3d at 107.  If the plaintiff satisfies this less than heavy burden, the defendant may then proffer a legitimate nondiscriminatory reason for the challenged action.  *Id.*  And if the defendant produces evidence

to that effect, the court must then determine whether the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause" of the employer's action. *Id.*

### 2. Alejandro Establishes a Prima Facie Case of Age Discrimination but Fails to Overcome the DOE's Proffered Nondiscriminatory Explanation

Alejandro has established a *prima facie* case of age discrimination. First, there is no dispute that Alejandro, who was approximately fifty-six years old during the 2012-13 school year, was within the protected age group. *See, e.g., Gorzynski*, 596 F.3d at 107 (ADEA protects those over forty years old). It is also uncontested that Alejandro was subject to several adverse employment actions in the form of suspensions without pay and, ultimately, termination. *See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001) (either "discharge" or "suspension without pay" may constitute adverse employment action) (internal quotation marks omitted).

Defendants, relying heavily on Polanco's negative appraisals of Alejandro's professional conduct, argue that Alejandro fails to demonstrate that she was "qualified" to be parent coordinator. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, Dkt. No. 54 ("Br.") at 6-8. The Court of Appeals has recognized, however, that when – as here – an employee's misconduct, as charged by the employer, is "inextricably intertwined with the employer's legitimate non-discriminatory reason for the employee's termination," it may be "inappropriate" to evaluate such matters "in the context of the *prima facie* case." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 492-93 (2d Cir. 2010) (citing, *inter alia*, *Owens v. N.Y.C. Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)). That is particularly so if the employee has submitted independent evidence that she "otherwise performed [her] job

satisfactorily." *Id.* at 493. Alejandro, who had undisputedly worked as a parent coordinator at

M.S. 80 for several years before Polanco's arrival, has proffered a performance evaluation from

the school year immediately preceding the one at issue that rates her performance "satisfactory"

and describes her having been an "excellent employee" over the previous four years who

"exceeded all . . . expectations." Plaintiffs' Ex. 4. Alejandro's burden of establishing her

qualification for the position at this stage is minimal, and this evidence is sufficient to meet it.

*See, e.g.*, *Ruiz*, 609 F.3d at 493 (relying on positive performance evaluations to conclude that

plaintiff had made *prima facie* case); *Williams-Velasquez v. Guardian Life Ins. Co.*, 99-cv-738,

2003 WL 22038567, at *10 (S.D.N.Y. Aug. 29, 2003) (deeming *prima facie* qualification for

position established based on "years of experience" and "positive performance evaluations").

Finally, the suspensions and termination occurred under circumstances giving rise to an

inference of age discrimination. Alejandro has marshalled at least some amount of evidence

suggesting that several of her long-time responsibilities as parent coordinator, including

conducting parent workshops and leading other community outreach efforts outside of school

grounds, were reassigned to newly hired community coordinators and community associates who

were several decades younger than Alejandro. August 2013 Alejandro Aff. ¶¶ 22-26; Alejandro

Dep. at 27-30, 58, 64; Defendants' Ex. DD (Community Coordination job description), Dkt. No.

58-32. Generally, such a transfer of responsibilities suffices to permit an inference of

discrimination at the *prima facie* stage. *See, e.g.*, *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129,

135-136 (2d Cir. 2000) (collecting cases).

For these reasons, Alejandro successfully carries her modest burden of making out a

*prima facie* case of age discrimination and is entitled to the presumption of discrimination that

affords. *Bickerstaff*, 196 F.3d at 446 (internal quotation marks omitted).

Defendants, however, also easily satisfy their burden of articulating a legitimate,

nondiscriminatory explanation for the adverse employment actions taken against Alejandro.

Indeed, Defendants have marshalled substantial documentary evidence that Alejandro

was subject to suspension and ultimately termination based on, among other things, a record of

absences well above M.S. 80's expressly stated threshold for what would count as "excessive,"

her failure to consistently follow school procedures in requesting time off, her persistent

delinquency in adequately and timely completing many of the tasks listed on the 2012-2013

parent coordinator job description, her failure to consistently submit written work to colleagues

for proofreading as instructed by Polanco, and her disregard of school rules and superior's

instructions in disseminating and posting flyers without Polanco's approval. *See supra* Sections

I.B.-D. & F; Br. at 6-9.  Alejandro corroborated several of these charges at deposition. *See, e.g.*,

Alejandro Dep. at 83-87, 237-244 (conceding that she did not hold monthly parent meetings, did

not plan parent-student trips, did not log all telephone-based or in-person communications with

parents, did not consistently distribute monthly newsletters, and failed to ensure the translation of

parent communications into any languages other than English).  There is no dispute that

Defendants met with Alejandro repeatedly to discuss her work performance, and expressly

warned her that failure to make improvements could result in further discipline and/or

termination.  Like Alejandro's task at the *prima facie* step, Defendants' burden of production at

step number two is "not a demanding one," *Bickerstaff*, 196 F.3d at 446, and the Court concludes

that it has been satisfied. *See, e.g., Yoselovsky v. Associated Press*, 917 F. Supp. 2d 262, 275-76

(S.D.N.Y. 2013) (legitimate, non-discriminatory explanation for termination articulated when

plaintiff consistently failed to meet deadlines, submitted low-quality work, demonstrated an

unprofessional attitude, and failed to follow directions, notwithstanding regular meetings with

superiors about performance issues and frequent warnings about termination); *see also Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."). Accordingly, the presumption of discrimination "falls away," and "summary judgment for the defendant is appropriate 'unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Franklin v. Liberty Lines Transit, Inc.*, 13-cv-6701, 2016 WL 1078283, at *5 (S.D.N.Y. Mar. 17, 2016) (quoting *James*, 233 F.3d at 154).

Turning, then, to the final prong of the *McDonnell Douglas* framework, the Court first notes that Alejandro has proffered evidence – though almost entirely through her own letters and affidavits – to suggest that several of Defendants' specific critiques of her job performance and attendance are, if nothing else, arguably incomplete or even unfair. Alejandro identifies for, example, certain written assignments that were timely submitted to Polanco via email, went unacknowledged, and were later characterized as late. Plaintiff's Exs. 5-6. She notes that other materials were untimely distributed to parents because Polanco failed to approve drafts or to sign off on certain required funding. *Id.* Alejandro marshals e-mails reflecting that several of the disciplinary conference postponements on which Polanco at least partially based the first of Alejandro's suspensions were necessitated by the unavailability of Alejandro's union representatives and by Alejandro's short-notice visit to her terminally-ill nephew – both developments of which Polanco was duly apprised. *Id.*; *see also* Opp. at 16-20. At least one other postponement may be attributable to Polanco's decision to initially select a date on which Alejandro was still on suspension. Plaintiff's Ex. 6. Alejandro also points out that Polanco criticized her for using school absences to extend weekends, notwithstanding that the M.S. 80

30

Staff Handbook explicitly prohibits only the extension of holidays, and that she was suspended for excessive absences (among other things) despite never receiving a "warning letter" as contemplated by the Handbook.  Opp. at 17-19; Defendants' Ex. H.

Accepted as true and taken together in the light most favorable to Alejandro, such evidence may arguably call into question a few of the many and varied documented bases for Defendants' negative appraisals of Alejandro's performance.  It could also conceivably permit the inference that Polanco was at times an unreasonable and mercurial supervisor and that working under his supervision may have been difficult, if not unpleasant.  What it does *not* alone permit, however, is precisely what is needed for Alejandro's claim to survive – an inference of *discrimination on the basis of age.  See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (summary judgment for employer warranted "when a plaintiff has offered only a *prima facie* case along with evidence that the defendant's stated nondiscriminatory reasons for an adverse employment action are pretextual" but nothing to support a reasonable inference "that age-based discrimination was a determinative factor"); *see also Sattar*, 129 F. Supp. 3d at 137-38 ("it is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, 'the fact-finder must believe the plaintiff's explanation of intentional discrimination'") (additional internal quotation marks omitted) (quoting *Reeves*, 530 U.S. at 147); *Landoldfi v. Am. Ass'n of Retired Persons*, 13-cv-7333, 2015 WL 5820710, at *7 (S.D.N.Y. Sept. 28, 2015) ("[T]hat Plaintiff's supervisor might have made a flawed assessment of Plaintiff s performance does not demonstrate that [defendant's] reasons for recommending Plaintiff's discharge were pretextual."); *Milano v. Astrue*, 05-cv-6527, 2008 WL 4410131, at *41 (S.D.N.Y. Sept. 26, 2008) ("[m]erely disagreeing with [plaintiff's] supervisor's assessment of [plaintiff's] work performance is insufficient to raise a triable issue of fact regarding pretext").

Alejandro also argues that her history of positive performance reviews prior to Polanco's arrival at M.S. 80 constitutes independent evidence that Defendants' explanation for her suspensions and termination is pretextual. Opp. at 15. As courts in this Circuit have recognized, however, "[a] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations," and "inconsistenc[ies]" in performance evaluations resulting from a change in management thus do "not support a finding of pretext." *Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996) (internal quotation marks omitted); *see also Pergament v. Fed. Express Corp.*, 2:03-cv-1106, 2007 WL 1016993, *12 (E.D.N.Y. Mar. 30, 2007) ("fact that [employee] had received generally positive evaluations from her previous . . . supervisor" did not support finding of pretext in defendant's decision to terminate plaintiff based new supervisor's negative assessments); *Brower v. Cont'l Airlines, Inc.*, 62 F. Supp. 2d 896, 906 (E.D.N.Y 1999) ("a prior positive performance review will not establish that a later unsatisfactory evaluation was a pretext for unlawful discrimination"). Alejandro's reliance in arguing otherwise on *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107 (2d Cir. 2004) is misplaced. Opp. at 15. In *Back*, the *same two supervisors* reviewed the school psychologist plaintiff regularly over the course of three years, and the evaluations reflected a "sudden decline" in their assessment of the plaintiff *during the course of a single year* – plaintiff's tenure review year – and that decline coincided with an emergent pattern of invidious comments about plaintiff's status as a working mother. 365 F.3d at 124-25. No such circumstances are presented here.

Nor does the evidence constituting Alejandro's *prima facie* case, standing alone, carry the day at this final stage. While the transfer of an employee's tasks to younger colleagues may suffice to make out a *prima facie* discrimination claim, the "redelegation of [a plaintiff's]

32

responsibilities to a younger employee, with no further evidence, does not alone support a

finding of age-based discrimination" at the last step of the *McDonnell Douglas* analysis when all

presumptions have been dropped. *Jetter v. Knothe Corp.*, 200 F. Supp. 2d 254, 265 (S.D.N.Y.

2002); *see also Schnabel*, 232 F.3d at 88-90 (plaintiff made out *prima facie* case based on

termination and replacement with younger employee but could not carry "ultimate burden" at

third step of *McDonnel Douglas*) (internal quotation marks omitted); *Fagan v. N.Y.S. Elec. &*

*Gas Corp.*, 186 F.3d 127, 134 (2d Cir. 1999) (plaintiff could not have "defeated summary

judgment merely by showing that he was replaced by these younger employees"); *Mendillo v.*

*The Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 339 (D. Conn. 2016) (even though "[t]he

transfer of a plaintiff's job responsibilities to a substantially younger employee suffice[d] to

establish an inference of age discrimination at the *prima facie* stage of the analysis," no

reasonable juror could "infer from the record evidence" that plaintiff's "age was the real reason"

for her termination).

Beyond the reassignment of certain of her responsibilities to younger community

coordinators and associates, Alejandro proffers essentially no admissible evidence from which a

reasonable juror could draw an inference of age discrimination. As with her sex discrimination

claim, Alejandro conceded at deposition that neither Polanco nor any other DOE personnel made

any age-related comments to or about her. Pl. Resp. ¶ 70; Alejandro Dep. at 58-61. She does not

identify any age-based criticisms of her work. She, once again, cites no specific examples of

otherwise similarly situated younger employees receiving relatively more favorable (or less

harsh) treatment from Polanco or the DOE. Although Alejandro, as discussed above, does

proffer copies of complaints by other M.S. 80 employees against the DOE raising allegations of

age discrimination among other things, such charges – which are evidently pending in state

33

court – do not constitute admissible evidence of discrimination *against Alejandro*. And, even if these unadjudicated complaints were admissible to prove the truth of their allegations,"[i]n the absence of specific, admissible evidence of facts bearing on Plaintiff's experience with [the employer], other employees' allegations that their adverse employment experiences were the product of discrimination are insufficient to rebut Defendants' proffered reasons for [the adverse employment action]." *Bailey v. Synthes*, 295 F. Supp. 2d 344, 356-57 (S.D.N.Y. 2003); *see also Punsal v. Mount Sinai Servs. of Mount Sinai Sch. of Med. of N.Y. Univ.*, 01-cv-5410, 2004 WL 736892, at *11 (S.D.N.Y. Apr. 6, 2004) ("[T]here is insufficient evidence in the record pertaining to discriminatory treatment directed towards plaintiff to warrant finding that other claims of discrimination rebut defendants' neutral reasons for the adverse employment action.").

The Court recognizes that there may be cases in which an ADEA claimant is able survive summary judgment by relying on his or her *prima facie* case along with evidence of pretext sufficient to give rise to an inference of discrimination. *See Schnabel*, 232 F.3d at 88-91 (discussing *Reeves*, 530 U.S. at 143-150). This is no such case. Alejandro makes out a minimalist *prima facie* case relying exclusively on the reassignment of certain tasks to younger employees, submits – for all intents and purposes – no further evidence of discrimination on the basis of her age, and raises questions about, at most, a few discrete portions of Defendants' extensive proffered explanation for her suspensions and terminations. On the undisputed record, no reasonable juror could infer that age was a "but-for" cause of Alejandro's suspensions and termination. *See Schnabel*, 232 F.3d at 88-91 (affirming summary judgment for employer when plaintiff had "not demonstrated that the asserted pretextual reasons were intended to mask age discrimination" and "beyond the minimal proof required to state a prima facie case ... ha[d] offered no evidence that he was discriminated against *because of his age*") (emphasis in

original); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93-94 (2d Cir. 2001)

(*prima facie* case based on age-related comments and reduction of average employee age plus

the "possibility" that employer's explanation was "pretextual" could "not in the end carry the

burden [plaintiff] bears of showing he was treated adversely for discriminatory reasons").

For these reasons, summary judgment on Alejandro's ADEA claim is GRANTED

### C.      Disability Discrimination Under the ADA Against DOE

#### 1.      Legal Framework

The ADA prohibits employers from "discriminat[ing] against a qualified individual on

the basis of a disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment." 42 U.S.C. § 12112(a); *see also McBride v. BIC Consumer Prods.*

*Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009). "Discrimination in violation of the ADA

includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability.'" *McBride*, 583 F.3d at 96

(quoting 42 U.S.C. § 12112(b)(5)(A)).

Disability discrimination claims under the ADA are, like the claims addressed above,

subject to the *McDonnell Douglas* burden-shifting analysis. *See McMillian v. City of N.Y.*, 711

F.3d 120, 125-26 (2d Cir. 2013). To make out a *prima facie* case of disability discrimination

premised on a failure to accommodate – as Alejandro attempts to do here[4] – a plaintiff must

---

[4] It is not entirely clear from Alejandro's Amended Complaint, which includes a single count claiming
substantive violation of the ADA, whether she attempts to assert independent claims for disability-based hostile
environment discrimination or for disability-based discriminatory suspension/termination. The pertinent portions of
Alejandro's opposition papers, however, appear to address only a failure-to-accommodate claim (as well as an ADA
retaliation claim addressed below), notwithstanding Defendants' express notice of motion for summary judgment on
all claims. Dkt. No. 51. The Court therefore assumes for purposes of this motion that Alejandro proceeds solely
under a failure-to-accommodate theory of liability (in addition to retaliation) with respect to the ADA.

demonstrate that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (internal quotation marks omitted). A "reasonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, [and] acquisition of devices to assist the performance of job duties . . . ." *McBride*, 583 F.3d at 97. The "plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment." *Id.* "The burden of persuasion on the 'existence' of an 'effective accommodation' is not satisfied by mere speculation." *Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000).

> **2.    The Record Evidence Does Not Support a Reasonable Conclusion that Alejandro Can Establish a *Prima Facie* Case of Failure to Accommodate**

Alejandro's disability discrimination claim is premised on Defendants' purported denial of reasonable workplace accommodations to address her HIV and her dyslexia conditions. She fails to establish a *prima facie* case on both fronts.

> **a.    No Actual or Constructive Notice of HIV**

Turning first to HIV, there is simply no evidence in the summary judgment record that would allow a reasonable juror to conclude that Defendants knew or should have known that Alejandro was HIV-positive during the course of events giving rise to this lawsuit.

"'It is elemental that an employer could not have discriminated against a plaintiff *because* of [her] disability if it was unaware that the plaintiff was, in fact, disabled.'" *Lewis v. Blackman*

36

*Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 305 (S.D.N.Y. 2014) (internal alterations omitted)
(quoting *Cozzi v. Great Neck Union Free Sch. Dist.*, 05-cv-1389, 2009 WL 2602462, at *14
(E.D.N.Y. Aug. 21, 2009)); *cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) ("If
[employer's hiring manager] were truly unaware that such a disability existed, it would be
impossible for her hiring decision to have been based, even in part, on respondent's disability.
And, if no part of the hiring decision turned on respondent's status as disabled, he cannot, *ipso
facto*, have been subject to disparate treatment.").

Although "[g]enerally, it is the responsibility of the individual with a disability to inform
the employer that an accommodation is needed," *Graves*, 457 F.3d at 184 (internal quotation
marks omitted), the Court of Appeals has held that an employer's duty to accommodate an
employee's disability may attach if the disability was sufficiently "obvious" that the employer
"knew or reasonably should have known" of its existence. *Brady v. Wal-Mart Stores, Inc.*, 531
F.3d 127, 135 (2d Cir. 2008).

Here, Alejandro testified at deposition that she never submitted documentation to the
DOE notifying it of her HIV condition and never disclosed it to Polanco's predecessor. *See*
Alejandro Dep. at 102-03. While Alejandro did testify, without any further explanation, that
Polanco would have learned of her status based on the FMLA leave request forms that she
submitted in February and March 2013, *id.*, those forms, as discussed above, are in the record
and do not discernably mention HIV, or any other condition, by name. *See, e.g.*, Defendants' Ex.
X. Alejandro conceded at deposition that she otherwise made no requests for accommodations
based on her HIV. Alejandro Dep. at 192-93. Alejandro proffers no evidence to suggest that her
condition was in any way "obvious," such that Defendants should have been aware of it without
express disclosure. In the Court's view, no reasonable juror could conclude from this record that

37

Defendants were on actual or constructive notice of Alejandro's HIV condition, and Alejandro

identifies no authority to the contrary. Accordingly, the Court concludes that Alejandro cannot

establish a *prima facie* failure-to-accommodate claim based on her HIV. *See, e.g., MacEntee v.*

*IBM (Int'l Bus. Machs.)*, 783 F. Supp. 2d 434, 444 (S.D.N.Y. 2011) (dismissing failure-to-

accommodate claim when plaintiff failed to plead any facts from which to infer that defendants

"had . . . actual or constructive knowledge of the need for any accommodation"), *aff'd*, 471 Fed.

App'x 49 (2d Cir. 2012) (Summary Order).

> **b.    No Reasonable Accommodations for Dyslexia Were Actually
> Denied**

Alejandro's failure-to-accommodate claim also may not proceed based on her dyslexia

condition, albeit for a different reason.

Defendants contend that, as with Alejandro's HIV condition, they had no notice that she

suffered from dyslexia, at least until they received her April 2013 cease-and-desist letter, and, to

the extent they did, they received no actual requests for accommodations and yet still provided at

least some of the tools that Alejandro claims to have been denied. Br. at 12-13. The Court has

no trouble rejecting the former argument. Alejandro testified that she made express verbal

disclosures regarding her dyslexia to Polanco's predecessor and then to Polanco himself during,

at least, their September 19, 2012 meeting to review Alejandro's written job description. *See* Pl.

Resp. ¶¶ 80-81; Alejandro Dep. 40-41, 149. A reasonable juror could plainly determine based on

that evidence that Defendants had sufficient notice of Alejandro's dyslexia. As explained below,

however, the Court agrees with Defendants that the record is devoid of evidence to support a

conclusion that Defendants *actually denied* any accommodations addressed to that condition.

Alejandro purports to identify three such requested accommodations: (i) continued access

to the phone master device, which she had used under Polanco's predecessor; (ii) additional time

38

to complete certain tasks; and (iii) assistance with editing written assignments.  Opp. at 5, 15-16, 22; Pl. Resp. ¶ 133; Plaintiff's Ex. 26.  Taking them in order, the record, as submitted to the Court, contains no admissible evidence to support the conclusion either that Alejandro requested access to the phone master during Polanco's tenure or that Polanco, or any other DOE personnel, denied that request.  To be sure, Alejandro's opposition papers assert that she asked Polanco if she could use the device and that Polanco responded by informing her that it was "broken" – a statement that Alejandro allegedly learned from a colleague to be false.  Pl. Resp. ¶ 93; Opp. at 4.  But the *only* evidence marshalled to support this proposition is one page from Alejandro's deposition testimony that is *excluded* from the materials that Alejandro submitted to the Court.  *See* Pl. Resp. ¶ 93; Opp. at 4 (citing Plaintiff's Ex. 1 at "p. 215").  The Court therefore cannot accept it.  *See, e.g., Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (collecting cases and explaining that the mere assertions of counsel in Local Rule 56.1 statements, without citation to admissible record evidence that actually supports the proposition, must be disregarded).  Based on the Court's review, there are two pieces of evidence in the record before it pertaining to the phone master device.  One is a paragraph from a declaration by Alejandro in support of her opposition to Defendants' motion in which she avers only that she was permitted to use the device under Polanco's predecessor to accommodate her dyslexia – *not* that she requested, and was denied, access during Polanco's tenure.  Alejandro Dec. ¶ 2.  The other is an exchange reflected in the transcript of the June 25, 2013 conference between Alejandro and Polanco – which, as discussed, Alejandro surreptitiously recorded – in which Polanco notes in a question to Alejandro that he "assume[d]" that she had been using the phone master to help make calls and Alejandro answers in the affirmative.  Defendants' Ex. R at 7.  No reasonable juror

could conclude from this evidence, without more, that Alejandro was denied access to the phone master during Polanco's tenure.

With regard to the extra time, there is no dispute that, on at least one occasion, Polanco summarily denied a request by Alejandro to work compensatory time. Plaintiff's Exs. 8-9. There is also no genuine dispute, however, that the e-mail in which Alejandro submitted the request made no mention of her dyslexia and in no way connected the overtime application to any work-related challenges associated with a medical condition. *See* Plaintiff's Ex. 8. Instead, Alejandro expressly framed her request as driven by the number of projects on her plate and the "time consuming" and "duplicat[ive]" nature of some of the work assigned to her. *Id.* Even looking beyond the face of the written request, the Court sees no admissible record evidence – and Alejandro identifies none – from which one could reasonably infer that her request related in any way to the effects of dyslexia. *See, e.g.*, Defendants' Ex. R (Transcript of June 25, 2013 Conference), at 18-19, 47-48 (discussing alleged requests for extra time based on extra slate of office duties). Indeed, even Alejandro's opposition papers candidly assert that Alejandro requested the compensatory time "[a]s a result of [her] heavy workload of clerical work," and "so that she could complete her other job responsibilities." Opp. at 14. Still further, Alejandro testified at deposition that she never requested any accommodation for her dyslexia condition prior to *February 2013* – months after her e-mail request for overtime was transmitted to Polanco. Alejandro Dep. at 192; *see also* Plaintiff's Ex. 25 (Alejandro informing OEO that she requested compensatory time "since [she had been] given additional responsibilities").

As the Court of Appeals has recognized, the ADA does not require employers to accommodate alleged "impairments" that do not "arise" in some way from the claimed disability. *Felix v. N.Y.C. Trans. Auth.*, 324 F.3d 102, 106-07 (2d Cir. 2003) (affirming summary judgment

for defendant employer when plaintiff was denied "a workplace accommodation for a mental condition . . . which [did] not flow directly from her disability"); *see also id.* at 106-07 (observing that plaintiff did not "argue to the [employer] that she was unable to work in the subway because such work aggravated her insomnia" (the disability), but rather "that she could not work in the subway because she was terrified of being alone and closed in")[5]; *see also Dudley v. N.Y.C. Hous. Auth.*, 12-cv-2771, 2014 WL 5003799, at *35 (S.D.N.Y. Sept. 30, 2014) (summary judgment for employer that denied request for plaintiff to work later hours when there was no evidence that stated preference for that schedule was based on any impairments caused by alleged disability); *cf. MacEntee*, 783 F. Supp. 2d at 444 (when plaintiff's request for an accommodation "did not mention that [the] request was because of her depression," defendants had "no actual or constructive knowledge of the need for any accommodations"). Because the only reasonable conclusion that a juror could draw from the evidence relied upon by Alejandro is that her asserted need for overtime in no way related to her dyslexia, the denial of her request cannot, as a matter of law, constitute the denial of a "reasonable accommodation" within the meaning of the ADA.[6]

Turning finally to assistance with editing written work, the record reflects unrebutted evidence that Polanco *urged* Alejandro, starting shortly after her dyslexia accommodation

---

[5] *Felix* was decided prior to the amendments to the ADA in 2008. The Court is aware of no authority, however, suggesting that the amendments altered the basic the requirement for an ADA claim – as recognized in *Felix* – that the reasonable accommodation at issue at least relate in some way to the claimed disability. *See* 42 U.S.C. § 12112(a) (prohibiting "discriminati[on]" against an employee with a disability "*on the basis of disability*") (emphasis added).

[6] Although the parties decline to address the issue, multiple courts within this District have recognized that merely "[c]ompleting work at a slower pace due to dyslexia does not ordinarily qualify as a disability under the ADA," and thus does not require employers to provide accommodations. *Teachout v. N.Y.C Dep't of Educ.*, 04-cv-945, 2006 WL 452022, at *5 (S.D.N.Y. Feb. 22, 2006); *see also Kamrowski v. Morrison Mgmt. Specialist*, 05-cv-9234, 2010 WL 3932354, at *9-10 (S.D.N.Y. Sept. 29, 2010) (collecting cases). Notwithstanding her burden to establish a *prima facie* case of disability within the meaning of the ADA, Alejandro proffers very little admissible evidence of the symptoms and effects of her dyslexia condition – a failure that might well constitute an independent ground for summary judgment on her ADA claim.

41

request in February 2013, to have colleagues proofread her work prior to submission, even

identifying at least one particularly convenient candidate by name, and that Alejandro did in fact

make use of such resources, at least some of the time.   Alejandro Dep. at 112-113, 191-92;

Defendants' Exhibit O; Defendants' Ex. R at 15, 24, 26.   Indeed, Alejandro testified that her

colleague Ms. Hughes started to review her written work following Alejandro's February 5, 2013

conference with Polanco, that Polanco was aware of and encouraged the arrangement, and that

Polanco never prevented Alejandro from submitting work to Ms. Hughes for review.   Alejandro

Dep. at 112-113, 191-92.  On the other side of the ledger, the Court is directed to no evidence

that Polanco ever denied Alejandro access to proofreading or otherwise interfered with her

ability to make use of it.   Based on this record, no reasonable juror could conclude that

Alejandro was denied a reasonable accommodation with respect to editing assistance.

For all of these reasons, Defendants' motion for summary judgment on Alejandro's

substantive ADA claim is GRANTED.

### D.    Interference with FMLA Rights Against DOE and Polanco

Alejandro next claims that Defendants interfered with the exercise of her rights under the

FMLA by administratively denying her March 2013 request for leave notwithstanding her

submission of a "completed FMLA request" that purportedly included "all statutorily required

information."  Amended Complaint, Dkt. No. 28 ("Am. Compl."), ¶¶ 129-132; Opp. at 22-23.

The FMLA provides, among other things, that "an eligible employee shall be entitled to

a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health

condition that makes the employee unable to perform the functions of the position of such

employee."  29 U.S.C. § 2612(a)(1) & (D).  The statute also makes it "unlawful for any employer

42

to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).

In order to "succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of America*, 817 F.3d 415, 424 (2d Cir. 2016). The Court of Appeals recently "formally adopt[ed]" the following elements of a *prima facie* claim of FMLA interference: "(1) that [the plaintiff] is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that [the plaintiff] was entitled to take leave under the FMLA; (4) that [the plaintiff] gave notice to the defendant of her intention to take leave; and (5) that [the plaintiff] was denied benefits to which she was entitled under the FMLA." *Id.*

Defendants argue that summary judgment on Alejandro's FMLA interference claim is appropriate because Alejandro fails to make a *prima facie* showing that she provided the DOE with sufficient notice of her intention to take leave. Br. at 14-15. The Court agrees.

As discussed above, it is undisputed that Alejandro submitted a DOE leave request form filled out by Alejandro and a physician (who is not clearly identified in the record or the parties' briefs), which Polanco executed and transmitted to Leaves for processing. In early April 2013, Leaves issued a letter advising Alejandro it could not "process [her] application at this time as some of the required information is missing: . . . detailed medical documentation [and] start and end date on FMLA application." Defendants' Ex. Y. Leaves requested that Alejandro provide the specified information within twenty-one business days and expressly invited her to contact the DOE's human resources platform with any questions. *Id.* It is also undisputed that Alejandro never responded to Leaves' request, and that Leaves advised Alejandro in June 2013

that it had denied her request based on "insufficient" documentation, her lack of response to its April 2013 letter, and the "incomplete" status of her application.   Pl. Resp. ¶ 61; Alejandro Dep. at 182; Defendants' Ex. AA.

Alejandro apparently does not dispute that the DOE was statutorily entitled to, and did, require all FMLA leave requests to be accompanied by "acceptable certification by a physician or other health care provider" and maintain a policy that "[l]eave may be denied if such documentation is not provided."   *See* Defendants' Ex. X; *see also* 29 U.S.C. § 2613 ("[a]n employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee");   29 C.F.R. § 825.306(a) ("When leave is taken because of an employee's own serious health condition . . . an employer may require an employee to obtain a medical certification from a health provider that sets forth," among other things, "a statement or description of appropriate medical facts regarding the patient's health condition for which FMLA leave is requested" and, if appropriate, "an estimate of the frequency and duration of the episodes of incapacity."); 29 C.F.R. § 825.306(e) ("In all instances in which certification is requested, it is the employee's responsibility to provide the employer with complete and sufficient certification and failure to do so may result in the denial of FMLA leave.").

Rather, Alejandro premises her interference claim entirely on the proposition that the DOE was "prohibited" under the FMLA from requesting follow-up information in response to her certification submission and from denying her leave request on the basis of her undisputed failure to provide that information.   Opp. at 22-23.   Although the Court is aware of no decisions in this Circuit assessing precisely this legal position, it is clearly at odds with the plain text of Department of Labor implementing regulations that Alejandro ignores entirely.   As several

44

Circuits have expressly recognized, those regulations – far from precluding follow-up requests – in fact *expressly require* employers to "advise an employee whenever the employer finds a certification incomplete or insufficient," to "state in writing what additional information is necessary to make the certification complete and sufficient," and to "provide the employee with seven calendar days . . . to cure any such deficiency." 29 C.F.R. § 825.305(c); *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 153 (3d Cir. 2015) (construing 29 C.F.R. § 825.305(c)); *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 578-79 (6th Cir. 2007) (characterizing it as an employer's "duty" to "inform [an employee] that her certification was deficient and to provide her with a reasonable opportunity to cure the deficiency"). Critically, "[i]f the deficiencies specified by the employer are not cured in the resubmitted certification, the employer may deny the taking of FMLA leave," and a "certification that is not returned to the employer is not considered incomplete or insufficient, but constitutes a failure to provide certification" in the first place. 29 C.F.R. § 825.305(c). Relying on these regulations, the Fifth Circuit has affirmed summary judgment for a defendant employer when an employee's physician submitted an FMLA request letter that, among other things, "fail[ed] to provide both the beginning date of her condition and its probable duration," the employer issued a letter in response "attempt[ing] to obtain more specific facts than the general information" included in the first submission, and the employee failed to respond within seven days, prompting denial of the leave request. *Miedema v. Facility Concession Servs., Inc.* 487 Fed. App'x 214, 216-18 (5th Cir. 2012) (Summary Order).

The record here contains unrebutted testimony that Leaves concluded that it could not process Alejandro's request because the certification submitted lacked both clear information as to Alejandro's diagnosis and information regarding the start and end dates that the application

was intended to cover. Newman Dep. at 57, 62-64. Further, there is uncontroverted testimony that Leaves ultimately denied Alejandro's request "[b]ecause she did not supply the requested information" set forth in its April 2013 letter. *Id.* at 76-77. Alejandro's request form, on its face, indeed leaves blank the fields for date of leave commencement and probable date of return to work, contains a single difficult-to-read word and numeric code in the diagnosis field, and declines to provide specifically requested information regarding Alejandro's treatment regimen, instead stating only "medication." Ex. X. No reasonable juror could conclude under the circumstances that the DOE was not entitled to request supplemental or clarifying information in response to that request. *See* 29 C.F.R. § 825.305(c) (a certification may be "considered incomplete if . . . one or more of the applicable entries have not been completed" and "considered insufficient if . . . the information provided is vague, ambiguous, or non-responsive"). And, as a matter of law, the DOE was clearly entitled to deny the request based on Alejandro's failure to submit the specified information. 29 C.F.R. § 825.305(c)-(d).

Alejandro's principal argument to the contrary, as noted, is that the FMLA expressly prohibits the sort of follow-up requests reflected in Leaves' April 2013 letter. Opp. at 23. Her authority for that position, however, is another implementing regulation, 29 C.F.R. § 825.307(a), which strictly limits the employer's ability to request additional information from the employee's health care provider once "*the employee submits a complete and sufficient certification.*" Opp. at 23. That provision, by its terms, does not govern circumstances like those at bar in which a complete and sufficient certification has not yet been submitted, and Alejandro's argument is therefore unavailing.

For these reasons, summary judgment on Alejandro's FMLA interference claim is GRANTED.

**E.    Retaliation Under Title VII, the ADEA, and the ADA Against the DOE and Retaliation Under the FMLA Against the DOE and Polanco**

In addition to her substantive discrimination and interference claims, Alejandro asserts

claims for retaliation under Title VII, the ADEA, the ADA, and FMLA.

**1.    Legal Framework**

Certain principles are substantially common across the retaliation provisions of the

relevant federal antidiscrimination statutes. As a general matter, "[t]o prevail on a retaliation

claim, the plaintiff need not prove that her underlying complaint of discrimination had merit, but

only that it was motivated by a good faith, reasonable belief that the underlying employment

discrimination practice was unlawful." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d

Cir. 2013) (internal quotation marks and citations omitted). Retaliation claims, like many of the

substantive claims discussed above, are "reviewed under the burden-shifting approach of

*McDonnell Douglas*." *Id.* (Title VII); *see also Bucalo v. Shelter Island Union Free Sch. Dist.*,

691 F.3d 119, 129 (2d Cir. 2012) (ADEA); *Best v. Duane Reade Drugs*, 14-cv-2648, 2017 WL

218251, at *5 (S.D.N.Y. Jan. 11, 2017) (ADA); *Hill v. N.Y.C. Housing Auth.*, __ F. Supp. 3d __,

2016 WL 6820759, at *7 (S.D.N.Y. 2016) (FMLA)

To establish a *prima facie* case of retaliation under Title VII, the ADEA, or the ADA, a

plaintiff must show "(1) participation in a protected activity; (2) the defendant's knowledge of

the protected activity; (3) an adverse employment action; and (4) a causal connection between

the protected activity and the adverse employment action." *Zann Kwan*, 737 F.3d at 844

(internal quotation marks omitted) (Title VII); *Kessler v. Westchester Cty. Dept. of Soc. Servs.*,

461 F.3d 199, 205-06 (2d Cir. 2006) (reciting substantially identical elements under ADEA);

*Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (same with respect to

ADA). Similarly, to demonstrate a *prima facie* claim of retaliation under the FMLA, the plaintiff

must show that "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for [her] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004) "Once the plaintiff has established a *prima facie* showing of retaliation, the burden shifts to the employer to articulate some legitimate non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845. If the defendant does so, the "plaintiff must then come forward" with evidence that the "non-retaliatory reason is a mere pretext for retaliation." *Id.*

"Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees." *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 523 (S.D.N.Y. 2016); *see also Zann Kwan*, 737 F.3d at 846 (evidence of causation may include "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action"); *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (causal connection may be established "indirectly" by "showing that the protected activity was closely followed in time by the adverse [employment] action") (internal quotation marks omitted) (brackets in original). Title VII retaliation claims, at least, "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2533 (2013). The Court of Appeals has not yet clarified whether that more stringent causation standard applies to retaliation claims brought under the other

antidiscrimination statutes at issue. *See, e.g., Campbell v. N.Y.C. Transit Auth.*, 662 Fed. App'x

57, 60 n.3 (2d Cir. 2016) (Summary Order) (ADEA); *Flieger v. E. Suffolk Boces*, 13-cv-6282,

2016 WL 3527519, at *18 n.12 (E.D.N.Y. Jun. 23, 2016) (ADA); *Brown v. Northrop Grumman

Corp.*, 12-cv-1488, 2014 WL 4175795, at *15-16 (E.D.N.Y. Aug. 19, 2014) (FMLA).

### 2.     Even Assuming That Alejandro Establishes *Prima Facie* Retaliation Claims, Those Claims Fail at the Third Step of *McDonnell Douglas*

Alejandro's retaliation claims are premised on the temporal proximity between three

purportedly protected activities – in the form of her late January or early February 2013

discrimination complaint to the DOE OEO, her April 2013 cease-and-desist letter to Polanco,

and her June 2013 request for FMLA leave based on "Major Depressive Disorder" – and her

suspensions in February 2013 and April 2013 and ultimate termination in July 2013.   Opp. at 10,

23-25.  Although the precise dates of some of Alejandro's actions are not immediately evident

from the record, there is no dispute that each action was followed by the relevant suspension or

termination by a few weeks at the most and, in one case, by just two days.   Notwithstanding

Defendants' somewhat curious (and unexplained) suggestion that Alejandro's termination is the

only appropriate temporal referent for the purposes of evaluating her retaliation claims, Br. at 18,

the Court is satisfied that the proximity identified by Alejandro is sufficient to give rise to an

inference of causation – under any applicable standard – at the *prima facie* stage.  *See, e.g., Zann

Kwan*, 737 F.3d at 845 (three-week period between protected activity and adverse action

sufficient to raise inference for purpose of *prima facie* retaliation case even under Title's VII but-

for causation standard).  Moreover, and as the Court has already noted, both unpaid suspension

and termination may qualify as adverse employment actions.  *See, e.g., Lovejoy-Wilson*, 263

F.3d at 223-24.

Even assuming *arguendo*, however, that some or all of Alejandro's actions constituted protected activities and that Defendants were aware of those actions,[7] Defendants have – as discussed at length above – articulated an extensive legitimate explanation for Alejandro's suspensions and termination. And, in the face of that explanation, Alejandro fails to proffer a sufficient basis for a reasonable juror to find a causal connection between her activities and Defendants' adverse actions. The Court of Appeals has recognized that when – as here – a retaliation claim is predicated principally upon timing, adverse employment actions that were "both part, and the ultimate product, of an extensive period of progressive discipline which began . . . months prior" to the employee's protected activities, a reasonable inference of retaliation cannot be drawn. *Slattery*, 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *see also Deebs v. Alstom Transp., Inc.*, 346 Fed. App'x 654, 658 (2d Cir. 2009) (Summary Order) (no inference of retaliation despite temporal proximity when "poor performance" record and at least one "legitimate firing on the basis of that record" predated the filing of plaintiff's EEOC complaint); *Yeger v. Inst. of Culinary Educ., Inc.*, 14-cv-8202, 2017 WL 377936, at *16 (S.D.N.Y. Jan. 25, 2017) (temporal proximity insufficient to support inference of retaliation when "the placement of [p]laintiff on leave and her ultimate termination were part of a sustained progression of performance critiques and discussions" that began "many months" before plaintiff lodged complaints); *Landoldfi*, 2015 WL 5820710, at *8 ("[b]y the time that Plaintiff made her age discrimination complaint" the defendant employer "had already compiled a substantial dossier documenting Plaintiff's incompetence and had taken significant remedial measures," including

---

[7] Alejandro declines to directly address these elements of the retaliation claims in her opposition brief.

issuing an "unsatisfactory . . . mid-year review"); *Dixon v. Int'l Fed'n of Accts.*, 09-cv-2839,

2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) (retaliation claim dismissed when plaintiff

"was subjected to repeated critiques and complaints about her management and performance

skills before she ever lodged any complaints about discrimination").[8]

Here, the suspensions at issue and Alejandro's termination were undisputedly part of a

series of negative performance and conduct assessments, attempted remedial measures,

disciplinary conferences, and escalating sanctions that began at least a month prior to

Alejandro's initial OEO complaint in January or February 2013 and, by the time of her

termination in July 2013, had been ongoing for at least six months.  Indeed, each of the adverse

actions that forms a basis for one of Alejandro's retaliation claims was preceded by at least one,

and as many as three, prior suspensions expressly attributed to her deficient attendance,

inadequate work, and/or insubordinate behavior, all accompanied by written notice that she could

be subject to a more severe sanction if her professional performance did not improve.  Each

employment action, moreover, followed a disciplinary conference convened to discuss

Alejandro's performance and was explained in writing by reference back to discussions at the

relevant conference.  Under the circumstances, no factfinder could reasonably infer a retaliatory

motive on the part of Defendants or find a causal connection (but-for, motivating-factor, or

otherwise) between Alejandro's complaints and Defendants' actions, even despite the noted

temporal proximity.  Accordingly, summary judgment on Alejandro's retaliation claims is

GRANTED.

---

[8] More generally, temporal proximity in and of itself is usually "insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext" in the retaliation context.  *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam).

### F.   NYCHRL Claims Against the DOE and Polanco

Having disposed of Alejandro's claims under Title VII, the ADEA, the ADA, and the

FMLA, the Court declines to exercise supplemental jurisdiction over the remaining claims under

the NYCHRL.  See *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per

curiam) (noting that "when the federal claims are dismissed the 'state claims should be dismissed

as well'") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); and citing *Pitchell*

*v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994)); see also *Marquez v. City of N.Y.*, 14-cv-8185, 2016

WL 4767577, at *15 (S.D.N.Y. Sept. 12, 2016) (declining to exercise supplemental jurisdiction

over NYCHRL after granting summary judgment on Title VII claims).

## IV.   Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is

GRANTED with respect to Alejandro's federal claims, and the Court declines to exercise

supplemental jurisdiction over the NYCHRL claims.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. No. 51 and to

close this case.

SO ORDERED.

Dated: March **31**, 2017
      New York, New York

ALISON J. NATHAN
United States District Judge

52